UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
C.M. and S.M., individually and on behalf of   :
student L.M.,                                      :
                 Plaintiffs,     :
                                        :      **OPINION AND ORDER**
v.                                  :
                                        :      18 CV 4409 (VB)
MOUNT VERNON CITY SCHOOL     :
DISTRICT,                                 :
                 Defendant.     :
--------------------------------------------------------------x
C.M. and S.M., individually and on behalf of   :
student L.M.,                                        :
                 Plaintiffs,     :
                                        :
v.                                  :      19 CV 5496 (VB)
                                        :
MOUNT VERNON CITY SCHOOL     :
DISTRICT,                                 :
                 Defendant.     :
--------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs C.M. and S.M. (the "Parents") are the parents of student L.M., a child with a

disability as defined under the Individuals with Disabilities Education Act ("IDEA").  They bring

these related actions against the Mount Vernon City School District (the "District") pursuant to

the IDEA, 20 U.S.C. §§ 1400 et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section

504"), 29 U.S.C. §§ 794 et seq.; Title II of the Americans with Disabilities Act (the "ADA"), 42

U.S.C. §§ 12132 et seq.; and Article 89 of the New York State Education Law.

       The Parents seek reversal of decisions by two state review officers ("SRO") of the New

York State Education Department.  The first SRO decision, dated January 17, 2018, reversed an

impartial hearing officer's ("IHO") October 13, 2017, decision, and determined L.M.'s in-district

placement at Rebecca Turner Elementary School ("RTES") offered L.M. a free appropriate

public education ("FAPE") for the 2016–2017 school year.  The second SRO decision, dated

February 19, 2019, upheld an IHO's November 18, 2018, decision, and determined L.M.'s in-district placement at RTES offered L.M. a FAPE for the 2017–2018 school year.  In both SRO decisions, the SROs determined, over the Parents' objections, that the District was factually capable of satisfying L.M.'s Individualized Education Program ("IEP") for the respective school years, at the recommended placement at RTES.  The SROs also affirmed the decision of the IHOs that L.M.'s pendency for 2016–2017 and 2017–2018 school years included extended school day ("ESD") services at the out-of-district placement.

The District seeks to uphold, and the Parents seek to reverse, both SRO decisions.  The Parents also seek leave to file a claim for attorney's fees and costs respecting the District's initial failure to pay for ESD services for the 2018–2019 school year.

Now pending are the parties' cross-motions for summary judgment.

For the reasons set forth below, the Parents' motion respecting the 2016–2017 school year (18 Civ. 4409 Doc. #40) is DENIED, and the Parents' motion respecting the 2017–2018 school year (19 Civ. 5496 Doc. #15) is GRANTED IN PART and DENIED IN PART.

The District's motion respecting the 2016–2017 school year (18 Civ. 4409 Doc. #36) is GRANTED, and the District's motion respecting the 2017–2018 school year (19 Civ. 5496 Doc. #20) is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

I.  <u>Statutory Framework</u>

The IDEA was enacted to promote the education of disabled children.  20 U.S.C. § 1400(d)(1)(A); <u>see</u> <u>Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).[1]  States receiving public funds are required to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public school districts must provide "'special education and related services' tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (first quoting 20 U.S.C. § 1401(a)(18); then quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children with disabilities residing in the State" to determine whether they require special education and related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA also requires states to create an IEP for each disabled student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP for each handicapped child.").  The IEP is a "comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).

In New York State, the responsibility for developing IEPs is assigned to local Committees on Special Education ("CSE").  N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  "CSEs are comprised of members appointed

---

[1]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175. "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id.

Under New York law, if parents disagree with any part of the IEP process, they may request an impartial due process hearing, administered by an IHO appointed by the local board of education. See 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO. See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g). The SRO's decision may then be challenged in federal court. See 20 U.S.C. § 1415(i)(2)(A).

II.   Factual Background

The parties have submitted briefs, statements of material fact pursuant to Local Civil Rule 56.1, and the record and exhibits from the IHO and SRO proceedings, which reflect the following factual background.[2]

---

[2]   "2016–2017 Tr." refers to the 2016–2017 IHO hearing transcript; "2017–2018 Tr." refers to the 2017–2018 IHO hearing transcript; exhibits identified by number (e.g., 2016–2017 Ex. 1, 2017–2018 Ex. 1) refer to exhibits submitted by the District at the 2016–2017 and 2017–2018 IHO hearings; exhibits identified by letter (e.g., 2016–2017 Ex. A, 2017–2018 Ex. A) refer to exhibits submitted by the Parents at the 2016–2017 and 2017–2018 IHO hearings; and exhibits identified by roman numeral (e.g., 2016–2017 Ex. I) refer to the IHO's exhibits from the 2016–2017 IHO hearing.

In addition, "Oct. 13, 2017 IHO Dec." refers to the IHO's decision for the 2016–2017 school year, and "Jan. 17, 2018 SRO Dec." refers to the SRO's decision of that appeal. "November 18, 2018, IHO Dec." refers to the IHO's decision for the 2017–2018 school year, and "Feb. 19, 2019 SRO Dec." refers to the SRO's decision of that appeal.

Each exhibit, including the IHO and SRO decisions, is individually paginated; the Court refers to those page numbers when citing to the exhibits.

L.M. is a student with a disability as defined in the IDEA.  Beginning at nineteen months, L.M. received applied behavior analysis ("ABA") through early intervention services.  At the time, the District placed L.M. at the Fred S. Keller School ("Keller") within the District.

At the start of the 2016–2017 school year, L.M. was eight years old.  His disability classification is "Autism Spectrum Disorder."  (2016–2017 Ex. 10).

### A.      2013–2014 School Year

At the start of the 2013–2014 school year, L.M. entered kindergarten at the Lincoln School ("Lincoln") within the District.  Although the Parents had concerns about L.M.'s placement at Lincoln, they agreed to the IEP and L.M.'s placement.

During kindergarten, L.M. exhibited increased negative behaviors and physical aggression towards himself and others.  In October 2013, the Parents requested a CSE meeting.  For the meeting, the Parents retained an educational consultant, Dr. Alexandra DeGeorge, who assessed L.M.'s kindergarten program at Lincoln and concluded that L.M.'s educational needs were not being met.  (See 2017–2018 Ex. G).

### B.      2014–2015 and 2015–2016 School Years

On June 17, 2014, in advance of the June 25, 2014 CSE meeting, the Parents complained in writing to the CSE about L.M.'s placement.  (See 2017–2018 Ex. M).  The CSE met again and heard additional concerns from the Parents.

On August 22, 2014, the CSE and the Parents agreed to place L.M. out-of-district at Bronxville Elementary School ("Bronxville") for first grade (the 2014–2015 school year).  At Bronxville, L.M. was placed in a special education class with eight students, one teacher, and four teaching assistants (i.e., 8:1+4).  In addition, Bronxville placed L.M. in its ESD program.  The District, through its CSE, placed L.M. at Bronxville for second grade (the 2015–2016 school

year), again with ESD services.  L.M. "made steady progress" at Bronxville in the first and second grades.

      C.    <u>2016–2017 School Year</u>

In advance of L.M. entering the third grade, the District convened a CSE meeting on May 5, 2016.  The CSE reviewed evaluations and proposed L.M. be placed in-district for third grade at RTES, in a special education class with eight students, one teacher, and two teaching assistants (<u>i.e.</u>, 8:1+2).  (<u>See</u> 2016–2017 Ex. 14 ("June 2016 IEP") at 13–14).  The CSE also recommended individual speech-language therapy twice per week, small group speech-language therapy once per week, individual occupational therapy twice per week, adapted physical education, a social skills group once per six-day cycle, quarterly small-group parent counseling and training, and testing accommodations.  (<u>See id.</u> at 13).  In addition, the CSE recommended L.M. receive in-district summer services in a 8:1+2 special class, with speech-language therapy and occupational therapy.  (<u>Id.</u> at 13–14).

The Parents requested an opportunity to learn more about the program, and between May and June 2016, they reviewed records, met with RTES staff, and observed RTES's special education program.

On June 24, 2016, the CSE reconvened to develop L.M.'s IEP.  The June 2016 IEP mandated a special class setting with a student teacher ratio of 8:1+2, with adapted physical education, speed and language therapy, occupational therapy, parent counseling and training, and a social skills group.  At the June 2016 CSE meeting, the Parents opposed the District's recommended program and argued the RTES placement was not appropriate for L.M.  The Parents proceeded to seek an impartial hearing on L.M.'s proposed placement at RTES, and asserted L.M.'s right to remain out-of-district at Bronxville while the proceedings were

underway.  Accordingly, L.M. remained at Bronxville for third grade (2016–2017 school year) with ESD services.

        D.      <u>2017–2018 School Year</u>

The CSE convened for the 2017–2018 school year on June 15, 2017.  Again, the District recommended placing L.M. at RTES in the 8:1+2 special class.  (<u>See</u> 2017–2018 Ex. 10 ("June 2017 IEP") at 13–14).  The CSE also recommended individual speech-language therapy once per six-day cycle, small group speech-language therapy twice per six-day cycle, individual occupational therapy twice per six-day cycle, adapted physical education, a social skills group twice per six-day cycle, monthly parent counseling and training, and testing accommodations.  (<u>See</u> <u>id</u>. at 13).

At the CSE meeting on June 15, the Parents opposed the District's recommended placement and argued RTES was not appropriate for L.M.  The Parents again proceeded to seek an impartial hearing on L.M.'s proposed placement at RTES and again asserted L.M.'s right to remain at Bronxville while the proceedings were underway.  L.M. remained at Bronxville for fourth grade (2017–2018 school year) with ESD services.

        E.      <u>Stipulation Between the Parties</u>

In October 2017, the Parents and the District entered into a settlement agreement in which the parties resolved the Parents' claim for compensation pertaining to the District's refusal to fund the ESD program at Bronxville for the 2017–2018 school year, from September 2017 through March 2018.  (<u>See</u> 18 Civ. 4409 Doc. #37-1 ("Partial Stipulation of Settlement")).  The stipulation resolved "the limited issue of compensatory services relating to the alleged violation of the Student's pendency entitlement with respect to the extended school day program, while continuing to litigate the remaining issues." (<u>Id</u>. at 2).

III.    Procedural Background

A.      2016–2017 IHO Hearing and Decision

On July 25, 2016, the Parents filed a due process complaint notice, in which they requested an impartial hearing and claimed the District failed to offer L.M. a FAPE for the 2016–2017 school year.  (See 2016–2017 Ex. 1).  Specifically, the Parents alleged the District's recommended placement could not provide community outings, a mainstream social skills group, or the appropriate amount of ABA instruction.  The Parents further argued the proposed placement at RTES was not the least restrictive environment ("LRE") for L.M.  Moreover, the Parents claimed the District prevented them from meaningfully participating in the IEP process because their consultant, Dr. DeGeorge, was not permitted to observe the recommended program at RTES and the District did not provide records the Parents had requested.

An IHO was appointed and conducted six days of hearings, on May 15, 16, 17, and 18; June 29; and August 16, 2017.[3]  The IHO issued a decision on October 13, 2017, concluding "RTES was not able to provide the services and supports [L.M.] requires as set forth in his IEP." (Doc. #1-1 ("Oct. 13, 2017 IHO Dec.") at 22).  The IHO granted the "Parents' request for an out-of-district placement for the 2016-2017 school year," finding "[t]here is no dispute regarding the appropriateness of the Bronxville placement as the Student has demonstrated meaningful education progress in the out-of-district program.  As such, the Student was properly placed at Bronxville for the 2016-2017 school year."  (Id. at 24).

_____

[3]      The IHO issued an interim order on July 27, 2017, finding that the Parents' due process complaint notice did not raise the issue of "whether the District failed to offer the Student an appropriate IEP and d[id] not allege deficits in the program or service recommendations on the IEP."  (2016–2017 Ex. IV ("Interim IHO Dec.") at 10–11).  Thus, the IHO's subsequent decision was limited to whether the District could implement L.M.'s IEP at RTES.  (Id. at 11).

The IHO offered several reasons to support the finding that the District could not implement L.M.'s IEP at RTES for the 2016–2017 school year.

First, the IHO found RTES was not able to implement L.M.'s daily living skills in the IEP, reasoning:

> Based on the foregoing, there is ample uncontroverted evidence that the Student's Daily Living Skills must be implemented and worked on in many settings including community outings. The Bronxville program and the District's own Consultant recognized the importance of practicing skills across many different environments, including from the classroom, to a "contrived setting" and into the community. The goals were specifically drafted for the Student to generalize the skills across environments, such as weekly walking trips into the community to specifically work on IEP goals. This premise is fundamental to the implementation of the Student's goals. The District cannot now claim that a different teaching methodology, in a contrived setting as opposed to a natural environment, could be used to implement the Student's IEP goals.

(Oct. 13, 2017 IHO Dec. at 13). The IHO noted "[t]wo of the Student's Daily Living Skills goals . . . explicitly include the need for community outings" and that "other . . . goals implicitly require community outings to achieve the daily living skills articulated in the goals." (Id. at 12). The IHO cited L.M.'s mother's testimony "that during her visit to meet the RTES staff, she asked the proposed classroom teacher if the class went on any trips or field trips and she responded no." (Id. at 11 (citing 2016–2017 Tr. at 671)). The IHO also cited testimony of the District's Supervisor of Special Education, Dr. Kimberly Mosca, who said at the June 2016 CSE that she "was not aware of the different opportunities" for community outings. (Id. (citing 2016–2017 Tr. at 300)). Finally, the IHO considered testimony from RTES classroom teacher Melissa Sansotta, who stated L.M.'s daily living skills goals could be achieved in the classroom without weekly community outings. (Id. at 12) (citing 2016–2017 Tr. at 340)). Ultimately, the IHO concluded that because RTES could not provide community outings, a placement at RTES would not satisfy L.M.'s daily living skills goals as identified in L.M.'s IEP.

9

Second, the IHO reviewed L.M.'s IEP, which noted "[w]hen working one to one or in a 2:1 setting, [L.M.'s] ability to attend to task increases in duration from 15 minutes to about 25 minutes." (Oct. 13, 2017 IHO Dec. at 14 (citing June 2016 IEP at 7)). Because the IHO found discrete trial training at RTES was "extremely limited," and determined that RTES could not provide discrete trial instruction in a 1:1 or 2:1 format, she determined RTES could not satisfy L.M.'s IEP in this regard. (Id. at 15).

Third, the IHO rejected as unsubstantiated the District's claims that it "was capable of implementing a mainstream social skills group," because there was no evidence "as to how the mainstream social skills program would be provided or what the program would look like or how it would be implemented." (Oct. 13, 2017 IHO Dec. at 16). The IHO noted such program was necessary and available at Bronxville through ESD services, but unavailable at RTES. (See id. at 16 n.15).

Fourth, the IHO determined there was "insufficient evidence to establish that in response to the Student's continued challenges with social-emotional functioning that RTES was able to provide support via a recommended mainstream social skills group or to provide an additional mainstream social skill group to remediate these difficulties." (Oct. 13, 2017 IHO Dec. at 17).

Fifth, the IHO determined there was "insufficient evidence to establish that RTES possesses or could possess, the sensory supports, services and equipment" L.M. needs. (Oct. 13, 2017 IHO Dec. at 19). In making this determination, the IHO considered testimony of Dr. Felicia Gaon, the Director of Student Services, who noted RTES has an occupational therapy room which is used for sensory therapy, but that RTES has no separate sensory room. (Id. at 19 (citing 2016–2017 Tr. at 161)). Neither the occupational therapist nor the physical therapist testified at the hearing.

And sixth, the IHO determined the staff at RTES lacked appropriate training to implement L.M.'s IEP.  The IHO noted that Ms. Sansotta confirmed "it was her first year teaching in this particular special class program."  (Oct. 13, 2017 IHO Dec. at 20–21 (citing (2016–2017 Tr. at 321)).  Indeed, Ms. Sansotta testified that her "prior experience teaching students on the autism spectrum was limited to two years in a 15:1 second and third graded class where there were students in the class that were classified with autism."  (Id. at 21) (citing 2016–2017 Tr. at 323, 363)).  Given the relative inexperience of Ms. Sansotta, as well as deficiencies in the clinic and training at RTES, the IHO found "RTES was not able to provide the services and supports the Student requires as set forth in [the] IEP."  (Id. at 22).

For these reasons, the IHO concluded the District had denied L.M. a FAPE:

The determination that the RTES did not have the capacity to implement the Student's IEP is based on facts uncovered by the Parents prior to the rejection of the placement and often confirmed at hearing.  The record demonstrates that the proposed placement was factually [incapable] of implementing the Student's IEP.  Specifically, RTES was not capable of implementing the Student's Daily Living Skills goals, providing an appropriate level of individualized instruction, providing mandated social skills, providing meaningful mainstream opportunities or a sensory program to meet the Student's needs.  In addition, the staff at RTES was not able to provide services to support the Student's needs as set forth in the IEP.

(Oct. 13, 2017 IHO Dec. at 24).  Accordingly, the IHO ordered the District to fund the cost of L.M.'s attendance at Bronxville for the 2016–2017 school year.  (Id. at 24–25).[4]

B.    2016–2017 SRO Decision

The District appealed to the SRO, insisting RTES was capable of implementing L.M.'s IEP.  The Parents cross-appealed the IHO's determination that the District did not impede their

---

[4]    The IHO also found the District did not impede the Parents' right to participate meaningfully in the IEP process even though their consultant was denied an opportunity to observe the RTES program.

participation in the development of L.M.'s IEP and placement, as well as the IHO's failure to make a final pendency determination respecting ESD services.

The SRO issued a decision on January 17, 2018.  (See Doc. #1-2 ("Jan. 17, 2018 SRO Dec.")).  As an initial matter, the SRO limited its decision to "whether [the District] was capable of implementing the June 2016 IEP at [RTES]," rather than opining on the substance of the IEP itself.  (Id. at 8).  In addition, the SRO determined that the stay put order included ESD services at Bronxville for the 2016–2017 school year because L.M.'s June 12, 2015 IEP— the most recent, agreed-to IEP—covered such services.  (Id. at 12).

Ultimately, the SRO reversed the IHO's determination respecting whether RTES was factually capable of satisfying L.M.'s IEP.  It noted "the IHO addressed a number of issues that were actually impermissible challenges to the appropriateness of the June 2016 IEP because they were not sufficiently tethered to the IEP."  (Jan. 17, 2018 SRO Dec. at 15 (citing N.K. v. N.Y.C. Dep't of Educ., 2016 WL 590234, at *6 (S.D.N.Y. Feb. 11, 2016)).  Examples of what the SRO determined the IHO improperly considered include:

> that the district did not "disabuse" the parents' concerns regarding mainstreaming; that the school could not provide a sensory program, or sensory supports, services and equipment, to meet the student's needs; that the school did not provide an appropriate amount of discrete trial instruction; and that the district public school did not have an adaptive skills program.  Because they were not written elements required under [the District's] proposed June 2016 IEP, these claims are not permissible challenges to [the District's] capacity to implement the IEP at its own public school site.

(Jan. 17, 2018 SRO Dec. at 16 (first citing M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015); then citing Y.F. v. N.Y.C. Dep't of Educ., 2016 WL 4470948, at *2 (2d Cir. Aug. 24, 2016) (summary order)).

First, the SRO addressed the IHO's determination that the District could not meet L.M.'s daily living skills goals because such goals "necessitated community outings (as they directed

that the student would purchase three items at a store every week and use the post office)."  (Jan.

17, 2018 SRO Dec. at 17 (discussing Oct. 13, 2017 IHO Dec. at 13)).  The SRO reasoned,

"[w]hile it is understandable that the student's ability to generalize skills to other environments

outside of the public school's sphere of influence is of great importance to the parents and is no

doubt a desirable objective for the student, it is not an objective explicitly set forth in the June

2016 IEP."  (Id. at 18).  Further, the SRO credited Dr. Gaon's testimony that "there were ways,

other than school outings, for the student to gain community experience and that outings were

not a necessary component of the student's daily program."  (Id. (citing 2016–2017 Tr. 140–41)).

Thus, the SRO concluded, to the extent RTES "could not arrange for community trips to the post

office, or trips to the store (other than the school cafeteria), the district's inability to provide

community outings was not such a material deviation from the student's IEP that it resulted in a

denial of a FAPE."  (Id. at 19) (citing Y.F. v. N.Y.C. Dept. of Educ., 2015 WL 4622500, at *6

(S.D.N.Y. July 31, 2015), aff'd, 659 F. App'x 3 (2d Cir. 2016) (summary order)).

Second, the SRO reasoned L.M.'s "IEP does not explicitly state that the student required

a specific amount of 1:1 or 2:1 instruction to derive educational benefit," and thus the IHO's

ruling regarding same was unsupported by the record.  (Jan. 17, 2018 SRO Dec. at 19).

Third, in considering the LRE, the SRO determined the record did not support the IHO's

determination that it was unclear whether RTES could "provide sufficient adult support for the

student to benefit from access to nondisabled peers."  (Jan. 17, 2018 SRO Dec. at 20).  For

example, the IHO considered evidence that at RTES, L.M. would not "eat lunch with

nondisabled peers," "mainstream for academics," and "participate in field trips with nondisabled

peers."  (Id.).  The SRO found "most of the issues raised . . . were not tethered to the June 2016

IEP."  (Id.)  According to the SRO, that RTES did not provide L.M. lunch with his nondisabled

peers was the only claim borne out in the record, and Dr. Mosca maintained RTES could provide

L.M. mainstreaming opportunities consistent with his IEP.  (Id. at 21 (citing 2016–2017 Tr. at

249)).  The SRO concluded:

> Based on the above, although [the District] did not approach providing the student
> with access to nondisabled peers in the same manner as the out-of-district public
> school, the evidence in the hearing record shows that [the District] could have
> implemented the provisions for mainstreaming that were included in the June 2016
> IEP with the support of the general education teachers and special education
> teaching assistants employed during the mainstreaming opportunities.

(Id.).

Fourth, the SRO determined "the hearing record does not support the IHO's conclusion

that [RTES] staff lacked adequate experience or training to implement the June 2016 IEP."  (Jan.

17, 2018 SRO Dec. at 23).  The SRO considered the conflicting testimony of the Parents' private

board certified behavior analyst (BCBA) Dr. Carol Fiorile as well as Dr. Mosca.  Dr. Fiorile

"testified that based on her review of the ABA 'consultation notes,' the assigned class would not

have been able to implement the student's IEP because monthly consultations were not sufficient

'to train staff who don't have previous experience implementing ABA instructional

programming.'"  (Id. at 23 (citing 2016–2017 Tr. at 837)).  But Dr. Mosca, who also has a Ph.D

in ABA and over three years' experience supervising classes with ABA instruction, explained:

"[Y]ou cannot specifically say the quality of instruction is completely tied to the amount of years

that people have been trained in the practice."  (Id. at 23 (citing 2016–2017 at Tr. 289)).  The

SRO also credited Dr. Mosca's testimony that "she did not have any concerns regarding the

district staff's ability to implement the June 2016 IEP."  (Id. (citing 2016–2017 Tr. at 274–76)).

The SRO noted, "[a]lthough the parents may have preferred that [RTES's] program include more

discrete trial instruction or data collection," the District's "description of its program does not

lead to the conclusion that an ABA program as represented to the parent at the CSE meeting

would not be carried out."  (Id. at 22–23).  Further, the SRO, unlike the IHO, assessed Ms.

Sansotta's training and recommendations, and did not consider her inexperienced.

Accordingly, the SRO concluded "the hearing record does not support finding that the

assigned school would have been incapable of implementing the IEP based on concerns over

experience or training."  (Jan. 17, 2018 SRO Dec. at 23–24 (citing Ganje v. Depew Union Free

Sch. Dist., 2012 WL 5473491, at *18 (W.D.N.Y. Sept. 26, 2012), report and recommendation

adopted, 2012 WL 5473485 (W.D.N.Y. Nov. 9, 2012)).

Finally, the SRO rejected the Parents' claim that they were prevented from meaningfully

participating when their educational consultant was not given an opportunity for a scheduled

visit.  (Jan. 17, 2018 SRO Dec. at 24).

In short, the SRO concluded:

[T]he IHO erred in finding that the district was not capable of implementing the
June 24, 2016 IEP.  The IHO determined that the appropriateness of the June 24,
2016 IEP was not at issue, but erred by engaging in a comparison of the student's
then-current out-of-district placement with the district's evidence of how it
intended to implement the June 2016 IEP at the recommended assigned school.
The parents demonstrated their preference for the out-of-district placement and no
one disputed that the student received educational benefits from his instruction
there.  Nevertheless, the district also demonstrated that it was factually capable of
implementing the June 2016 IEP, the appropriateness of which was not in dispute,
at the recommended placement.

Having reviewed each of the parents' remaining challenges in their cross-appeal,
and having determined the student's pendency placement, I find the district was
capable of implementing the June 2016 IEP at the assigned school.

(Jan. 17, 2018 SRO Dec. at 25).

C.      2017–2018 IHO Hearing and Decision

On July 28, 2017, following the CSE for the 2017–2018 school year—which

recommended L.M.'s placement at RTES for fourth grade pursuant to his June 2017 IEP—the

Parents again filed a due process complaint in which the Parents requested an impartial hearing

and claimed the District failed to offer L.M. a FAPE for the 2017–2018 school year.[5]  The

Parents amended their due process complaint on January 2, 2018, to include claims alleging the

District failed to pay for ESD services at Bronxville.  (See 2017–2018 Ex. GGG at 19).

The appointed IHO and the parties participated in a seven-day hearing on December 21,

2017; March 12, 14, 15; April 24; May 23; and June 24, 2018.  (See 19 Civ. 5496 Doc. #1-1

("Nov. 18, 2018 IHO Dec.")).  The IHO issued a decision on November 18, 2018, finding the

District "met its burden of showing that the program it offered was sufficiently reasonably

calculated to have addressed LM's educational needs, in light of LM's circumstances, had the

parents opted to place LM [at RTES]."  (Id. at 14).  The IHO denied the Parents' request for the

District to fund L.M. at Bronxville for the 2017–2018 school year because the program offered at

RTES "appears to have been reasonably calculated to provide a free and appropriate [education]

to LM in light of LM's circumstances and therefore placing LM in that program, while not what

LM's parents prefer, does comport with the . . . District's obligations."  (Id.).

The IHO offered several reasons to support his finding that the District offered L.M. a

FAPE at RTES.  First, he noted the District's program is similar to what was offered at

Bronxville because RTES offers "adaptive physical education, speech and language therapy,

occupational therapy parent counseling and a social skills group" (Nov. 18, 2018 IHO Dec. at 10

(citing June 2017 IEP)), and "utilizes ABA, similar to the ABA utilized in Bronxville."  (Id. at

10 (citing 2017–2018 Tr. at 380)).

Second, the IHO credited the testimony of Dr. Mosca "that techniques to address LM's

management needs could have been implemented with the recommended [8:1+2] class at

---

[5]        On July 11, 2018, the Parents requested an order from the IHO on the issue of pendency,
but on July 13, 2018, the IHO declined to rule on that issue.

RTES."  (Nov. 18, 2018 IHO Dec. at 10 (citing 2017–2018 Tr. at 535–536)).  Indeed, the IHO

further noted, "the district's program appears reasonably calculated to address LM's learning

needs successfully.  And the placement, based on the testimony, it appears, could have

implemented the IEP."  (Id. at 12).

Third, the IHO noted, "[w]hen students are [mainstreamed] in the [District] program, two

teaching assistants travel with them, to support them" (Nov. 18, 2018 IHO Dec. at 11 (citing

2017–2018 Tr. at 409–10), which the IHO reasoned "would seem to take care of the

mainstreaming issue."  (Id. at 11).

Fourth, respecting daily skills goals, the IHO noted, "[t]he district did not demonstrate

that [community] outings would have been utilized in the district's program, as they apparently

are in Bronxville."  (Nov. 18, 2018 IHO Dec. at 12).  The IHO reasoned that while such outings

"could be of benefit to LM, the loss of this activity was not shown to be of sufficient magnitude

in its effects, that it would invalidate that the [District] program."  (Id.).

And fifth, the IHO noted "th[e June 2017] IEP includes descriptions of how LM is

functioning, based upon input from his [Bronxville] teacher as well as from related service

providers," and that "although the district's personnel have not worked directly with LM

recently, they did appear to consider the views of those who did work with LM, with regard to

LM's levels of functioning, in the [formulation] of the IEP."  (Nov. 18, 2018 IHO Dec. at 13).

The IHO further reasoned that because the IEP must be prospective, and because the District

cannot supplement the IEP at a later date:

> It appears that the parents understood that the behavioral and ABA approach would
> have been utilized. It is not clear to me, however, that the parent [understood] what
> the district's parent counseling and training would have entailed. This is a drawback
> in the district's case, it appears to me, though by itself, is not sufficient for me to
> hold that the overall program would not have met LM's needs.

(Id.).

The IHO concluded:

[T]he district has met its burden of showing that the program it offered was sufficiently reasonably calculated to have addressed LM's educational needs, in light of LM's circumstances, had the parents opted to place LM in it.  Had LM's parents placed LM in the district's program, LM would likely have obtained educational benefits and grown in his abilities, through participation in this program.

(Nov. 18, 2018 IHO Dec. at 14).

     D.    2017–2018 SRO Decision

The Parents appealed the IHO decision to the SRO on December 21, 2018.  The Parents argued the IHO erred in finding the District provided L.M. a FAPE, and the Parents also sought an order from the SRO confirming L.M.'s pendency placement for the 2018–2019 school year. (19 Civ. 5496 Doc. #1-2 ("Feb. 19, 2019 SRO Dec.")).

On February 19, 2019, the SRO upheld the IHO's decision respecting L.M.'s placement at RTES.  However, the SRO ordered the District to continue to provide L.M. with services at Bronxville, including ESD services, during the pendency of the appeals.

As an initial matter, the SRO determined the IHO erred when he refused to rule on the issue of pendency.  The SRO reasoned "[t]here being no other pendency changing event in July 2018, the IHO should have issued an order on pendency establishing that the student's pendency placement" at Bronxville, which includes ESD services."  (Feb. 19, 2019 SRO Dec. at 14).

In addition, the SRO ruled that the IHO erred by applying a Burlington/Carter tuition reimbursement analysis.  (Feb. 19, 2019 SRO Dec. at 15).  The SRO reasoned:

Given that it was the district, not the parents, that placed the student at the out-of-district school; that the out-of-district school was a public school, not a private school or facility; and that the student has continued attending this school without the parents undertaking the requisite financial risk of a unilateral placement, the matter does not fall into the Burlington/Carter framework.  Instead, this matter is

18

more akin to a request that the district prospectively place the student at the out-of-district public school for the 2017-18 school year.

(Id.).

Respecting the merits, first, the SRO considered whether L.M.'s sensory needs would be met at RTES.  The SRO noted the June 2017 IEP "included information from the teacher's annual review report about the student's sensory needs including that he required a sensory diet, along with 'the regular use of a sensory room' . . . and access to sensory breaks throughout his day to increase attention to task."  (Feb. 19, 2019 SRO Dec. at 19 (comparing 2017–2018 Ex. OO at 3, with June 2017 IEP at 9–10)).  The IEP also included "reports from the occupational therapist that the student enjoyed sensory motor activities at the start of each session and provided that the student would receive 30-minutes of individual OT twice per six-day cycle." (Id. (citing June 2017 IEP at 9, 13)).  The SRO considered the testimony of the special education teacher, Danielle Grandazzo, that RTES could offer L.M.:

> opportunities for sensory input both in the classroom and in the building, including an area of the classroom designated for sensory input (with several different bins of sand, rice, and beans, as well as different types of playdough and slime), a designated space for OT in the building, and a separate area with a swing that was accessible to students throughout the day.

(Id. at 19 (citing 2017–2018 Tr. at 376–77, 405–07)).  The SRO rejected the Parents' argument that such testimony is retrospective, and determined the testimony "explains or justifies the services listed in the IEP" and, thus, may be considered.  (Id. at 20 (citing R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 188).  The SRO concluded, "the June 2017 [IEP] described and addressed the student's sensory needs consistent with the information available to it; accordingly, the parents' claim that the IEP failed to address the student's sensory needs is without merit."  (Id.).

Second, the SRO considered the Parents' argument that the IHO erred when he failed to address their claim that "the District failed to offer an appropriate IEP when the June 2017 CSE

'reduced' the special class ratio recommendation from an 8:1+4 to an 8:1+2 special class and failed to offer the student a 1:1 'teaching aide.'" (Feb. 19, 2019 SRO Dec. at 20). The SRO credited the testimony of Dr. Mosca that L.M.'s "June 2017 progress report provided documentary evidence that the student did not require as much adult support as was in an 8:1+4 special class" and thus, "recommended an 8:1+2 special class placement" for the 2017–2018 school year. (Id. at 21 (citing 2017–2018 Tr. at 517–27; 2017–2018 Ex. PP; June 2017 IEP at 1–2)). Further, Ms. Grandazzo testified that the District's proposed 8:1+2 placement "was individualized based on [the] student's needs and, with two teaching assistants in the classroom." (Id. at 22 (citing 2017–2018 Tr. at 395–96)).

Pursuant to state regulations, the SRO also assessed the factors CSEs consider, such as the goal of reducing the need for 1:1 teaching aide support, the support a 1:1 aide would provide, and staffing ratios. (See Feb. 19, 2019 SRO Dec. at 23 (citing N.Y. Comp. Codes R. & Regs. tit. 8, ("NYCRR") 200.4(d)(3)(vii)). The SRO concluded:

> the hearing record supports the IHO's conclusion that the CSE's recommendation of an 8:1+2 special class, in conjunction with the recommended related services . . . was designed to provide the student with sufficient individualized support such that the IEP was reasonably calculated to enable the student to receive educational benefits for the 2017-18 school year.

(Id. at 23 (first citing Z.D. v. Niskayuna Cent. Sch. Dist., 2009 WL 1748794, at *6 (N.D.N.Y. June 19, 2009); then citing Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004)).

Third, the SRO considered whether the CSE's decision to refuse to recommend ESD services failed to offer L.M. a FAPE, and concluded that because L.M. "does not require extended day services in order to receive an educational benefit from his school program," ESD services were not required. (Feb. 19, 2019 SRO Dec. at 24). The SRO noted L.M.'s June 2017

IEP "provided annual goals to improve the student's ability" such as "to gain the attention of his peers before commenting/requesting; to pose a question to his peer and wait for an answer; to strengthen reciprocal conversation and question/answer skills with a peer; and engage in appropriate cooperative social play interactions initiated by others." (Id. at 24 (June 2017 IEP at 11–12)). Accordingly, the CSE recommended L.M. receive "three sessions per week of speech-language therapy and twice weekly small group social skills instruction consisting of one session with peers in the same grade and one with students in the grade below." (Id. (citing June 2017 IEP at 13)). The SRO then considered the testimony of District school psychologist Rebecca Ivicic and Dr. Mosca, both of whom testified the school day programs at RTES were sufficient to satisfy L.M.'s IEP respecting his social skills, and that ESD services were not required. (Id. at 25 (2017–2018 Tr. at 217–18, 534–35)).

The SRO determined the ESD services at Bronxville were "for the stated purpose of reinforcing and generalizing skills," and "the IDEA does not require school districts as a matter of course to design educational programs to address a student's difficulties in generalizing skills to other environments outside of the school environment," particularly "when the student is otherwise likely to make progress in the classroom." (Feb. 19, 2019 SRO Dec. at 25–26 (first citing F.L. v. N.Y.C. Dep't of Educ., 2016 WL 3211969, at *11 (S.D.N.Y. June 8, 2016); then citing L.K. v. N.Y.C. Dep't of Educ., 2016 WL 899321, at *8–10 (S.D.N.Y. Mar. l, 2016), aff'd in part, 674 F. App'x 100 (2d Cir. Jan. 19, 2017) (summary order)). Accordingly, the SRO concluded the IHO did not err, and that ESD services were not required for L.M.'s June 2017 IEP.

Fourth, the SRO rejected the Parents' assertion that the District's failure to notify them about counseling and training denied L.M. a FAPE, and moreover, that the District did not deny

the Parents an opportunity to meaningfully participate in the IEP process.  The SRO noted "State

regulations require that an IEP indicate the extent to which parent counseling and training will be

provided to parents, when appropriate" (Feb. 19, 2019 SRO Dec. at 26 (citing 8 NYCRR

200.4(d)(2)(v)(b)(5)), and such regulations "provide for the provision of parent counseling and

training for the purpose of enabling parents of students with autism to perform appropriate

follow-up intervention activities at home."  (Id. at 26 (citing 8 NYCRR 200.13(d)).  Although the

SRO noted the IHO's decision was inaccurate regarding the assertion "that parent counseling and

training was not 'specifically listed' on the IEP" (Id. (citing Nov. 18, 2018 IHO Dec. at 13)), the

SRO determined "the Second Circuit has consistently held that the failure to include parent

counseling and training on an IEP does not usually constitute a denial of a FAPE."  (Id. (citing

L.O. v. N.Y.C. Dep't of Educ., 822 F.3d 95, 122–23 (2d Cir. 2016); M.W. v. N.Y.C. Dep't of

Educ., 725 F.3d 131, 141–42 (2d Cir. 2013)).

Fifth, the SRO evaluated the Parents' position that the IHO failed to address whether the

June 2017 IEP would place L.M. in the LRE.  The SRO laid out the correct legal framework for

such determination:

> In determining an appropriate placement in the LRE, the IDEA requires that
> students with disabilities be educated to the maximum extent appropriate with
> students who are not disabled and that special classes, separate schooling, or other
> removal of students with disabilities from the general educational environment may
> occur only when the nature or severity of the disability is such that education in
> regular classes with the use of supplementary aids and services cannot be achieved
> satisfactorily.

(Feb. 19, 2019 SRO Dec. at 27 (citing 20 U.S.C. § 1412(a)(5)(A)); see also 34 C.F.R.

300.114(a)(2)(i), 300.116(a)(2); 8 NYCRR 200.6(a)(1)).

> [T]he Second Circuit adopted a two-pronged test for determining whether an IEP
> places a student in the LRE, considering (1) whether education in the general
> classroom, with the use of supplemental aids and services, can be achieved

22

satisfactorily for a given student, and, if not, (2) whether the school has mainstreamed the student to the maximum extent appropriate.

(Id. at 28 (first citing T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 161–67 (2d Cir. 2014) (applying Newington two-prong test); then citing P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 119–20 (2d Cir. 2008)).

The SRO concluded that although there was no dispute as to the first prong—L.M. required a special education class—as to the second prong, over the Parents' objections, the SRO found the District could sufficiently mainstream L.M. at RTES pursuant to his IEP, and thus placed him in the LRE.  The SRO concluded even though "the June 2017 IEP stated that the student 'will not participate in general education programs because he requires special instruction in an environment with a smaller student to teacher ratio and minimal distractions in order to progress in achieving' the learning standards,"  L.M.'s June 2017 IEP also said that L.M. "will have lunch and recess with typically developing peers in addition to one extra period during the day such as art, physical education, or an academic period as appropriate."  (Feb. 19, 2019 SRO Dec. at 29 (discussing June 2017 IEP at 15)).  The June 2017 IEP indicated other opportunities for mainstreaming at RTES, for example, during physical education.  Ultimately, the SRO rejected the Parents' argument that the District's focus on the class rather than the individual denied L.M. placement in the LRE, and instead determined L.M.'s "IEP allows for . . . flexibility by providing that the student would attend 'one extra period during the day' with nondisabled peers 'such as art, physical education, or an academic period as appropriate.'"  (Id. (citing June 2017 IEP at 15)).

Sixth, the SRO concluded the IHO did not err when he did not address the Parents' claims that their right to meaningfully participate was impeded when the District failed to respond to certain requests from the Parents, or when the District refused to allow the Parents'

privately retained BCBA to visit RTES.  The SRO concluded the District "cannot be said to have withheld information from the parents to the degree that the parents were, as a result, unable to form a judgment about the proposed district program.  On the contrary, the parents appeared to have a firm opinion about the proposed program at the CSE meeting."  (Feb. 19, 2019 SRO Dec. at 32).

Finally, the SRO considered the Parents' assertions that the IHO "impermissibly relied on retrospective testimony to conclude that the district could implement the student's IEP" and the IHO erred when he determined that the District's inability to provide community outings, for L.M.'s daily living skills, "was not of such material deviation from the student's IEP that it resulted in a denial of a FAPE."  (Feb. 19, 2019 SRO Dec. at 32).

The SRO determined that the IHO reached on his own the issue of whether the District was capable of implementing L.M.'s June 2017 IEP at RTES.  (See Feb. 19, 2019 SRO Dec. at 33–34).  Accordingly, the SRO "decline[d] to disturb the IHO's determination that the evidence indicated the district could implement the June 2017 IEP" at RTES because, on appeal, the Parents challenged the evidence on which the IHO relied rather than the IHO's "factual determination that the district could implement the IEP."  (Id. at 34).

Respecting community outings, the SRO determined that of the three daily living skills goals of L.M.'s June 2017 IEP, there "is no reference to an area of need that relates to the goal that the student will approach a counter in order to order one item."  (Feb. 19, 2019 SRO Dec. at 34–35).  Although Dr. Fiorile testified that it is generally important for students with autism to go into the community, such testimony was another example of generalizing skills across environments and not required by the IDEA.  (Feb. 19, 2019 SRO Dec. at 35 (first citing 2017–2018 Tr. at 1054; then citing F.L. v. N.Y.C. Dep't of Educ., 2016 WL 3211969, at *11).

Moreover, the SRO agreed with the IHO that even if the District could not implement L.M.'s

daily living skills goals in the community, such failure "would not amount to a material deviation

from the student's IEP such that it would amount to a denial of a FAPE." (Id.).

**DISCUSSION**

I.      Standard of Review

        In federal court, parties seeking review of administrative decisions in cases brought under

the IDEA usually do so by motion for summary judgment.  See Viola v. Arlington Cent. Sch.

Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  However, unlike in an ordinary summary

judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the

motion.  Id.  Rather, summary judgment in an IDEA case functions as an appeal from an

administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir.

2009).

        In this context, the Court:  (i) reviews the record of the administrative proceedings;

(ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems

appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).

        "The role of the federal courts in reviewing state educational decisions under the IDEA is

circumscribed."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112–13 (2d Cir. 2007).

The standard of review "requires a more critical appraisal of the agency determination than clear-

error review but nevertheless falls well short of complete de novo review."  M.H. v. N.Y.C.

Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

        "[T]he deference owed to an SRO's decision depends on the quality of that opinion."

R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.  "Reviewing courts must look to the factors that

normally determine whether any particular judgment is persuasive, for example, whether the

decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id. The Second Circuit's approach requires district courts to consider the following:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.

Under such deferential review, "[w]here the IHO and SRO disagree," the Court "defer[s] to the reasoned conclusions of the SRO as the final state administrative determination." C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014). However, where the SRO's determinations are insufficiently reasoned to merit deference, the courts should defer to the IHO's analysis. Id. "Additionally, the courts should defer to the IHO's analysis when considering an issue not reached by the SRO." Id.

## II.   FAPE

The IDEA requires states receiving federal funds to provide a FAPE to "all children with disabilities." Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C. § 1412(a)(1)(A)). "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits." Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 214 (2d Cir. 2014). "To ensure that qualifying children receive a FAPE, a school district must create an [IEP] for each such child." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at

175 (citing 20 U.S.C. § 1414(d)).  "The IEP is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  Id.  The IEP "must be likely to produce progress, not regression, and must afford the student with an opportunity greater than mere trivial advancement.  However, it need not furnish every special service necessary to maximize each handicapped child's potential."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 224.

To decide whether an IEP complies with the IDEA, courts follow a two-part test.  See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206–07.  At the first step, courts examine the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190.  At the second step, courts weigh the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits."  Id.  "[C]hallenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation."  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 244.

To meet its procedural obligations under the IDEA, a school must provide the parents with "an adequate opportunity to participate in the development of [their child's] IEP."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).  To provide such participation, the parents must be provided:

> [a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.

Id.  (citing 20 U.S.C. § 1415(b)(1)).

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017).  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."  Id.  "The IEP must aim to enable the child to make progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement."  Id.  Indeed, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential."  Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.

III.     2016–2017 School Year

The Parents argue the Court should reverse the SRO's decision that the District's placement at RTES provided L.M. a FAPE for the 2016–2017 school year, whereas the District argues the Court should find the District did offer L.M. a FAPE, and that the Court should overturn the SRO's decision that L.M.'s pendency placement at Bronxville included ESD services.

The Court disagrees with the Parents respecting the SRO's decision, and finds the SRO's decision is entitled to deference because it is thorough, well-reasoned, and supported by the record.  And for the same reasons as the Court defers to the SRO on the question of whether the District offered L.M. a FAPE for the 2016–2017 school year, the Court disagrees with the District respecting the pendency provision because that determination, which includes ESD services at Bronxville, is supported by the record.

A.   <u>Deference</u>

The Parents first argue the 2016–2017 SRO Decision should not be entitled to deference because the SRO "completed a cursory review of the administrative record, selected documentary and testimonial evidence that supported his conclusion, misapplied the law and improperly relied on retrospective testimony."  (Doc. #42 ("2016–2017 Parents' Mem.") at 8).

The Court disagrees.

As noted above, the Second Circuit has explained that "the deference owed to an SRO's decision depends on the quality of that opinion," <u>R.E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d at 189, or its "persuasiveness."  <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d at 244.  "In other words, the district court should examine the SRO's decision and determine 'whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.'"  <u>C.L. v. N.Y.C. Dep't of Educ.</u>, 2013 WL 93361, at *5 (S.D.N.Y. Jan. 3, 2013), <u>aff'd</u>, 552 F. App'x 81 (2d Cir. 2014) (summary order), <u>as amended</u> (Feb. 3, 2014) (citing <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d at 244).  A district court thus "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  <u>Id</u>. (citing <u>R.E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d at 189).

Here, as noted above, the SRO's decision that the District's proposed placement at RTES provided L.M. a FAPE is entitled to deference.  It is well-reasoned, based on substantially greater familiarity with the evidence and the witnesses than this Court, grounded in thorough and logical reasoning, based on the same evidence as presently before the Court, and concerns the substantive adequacy of the proposed placement to satisfy L.M.'s June 2016 IEP.

The Parents argue the SRO's decision should not be entitled to deference because the SRO cited law that the Second Circuit subsequently reversed, to support the decision that the District still provided L.M. a FAPE even when RTES was unable to provide 1:1 or 2:1 adult support.  The Court is not persuaded.  The citation with which the Parents take issue is J.D. v. N.Y.C. Dep't of Educ., 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015).  But that citation in the SRO decision was from another case—G.S. v. N.Y.C. Dep't of Educ., 2016 WL 5107039, at *15 (S.D.N.Y. Sept. 19, 2016)—which quotes J.D. for the proposition that "a parent's own testimony that [school] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and [could] thus [be] properly excluded from consideration."  (See Jan. 17, 2018 SRO Dec. at 20).  Moreover, the Second Circuit's decision in J.D. did not address such testimony.  See J.D. v. N.Y.C. Dep't of Educ., 677 F. App'x 709, 713 (2d Cir. 2017).  Thus, the grounds for reversal in J.D. are not relevant to the SRO's decision that because L.M.'s June 2016 IEP did not require 1:1 or 2:1 instruction, the 8:1+2 special class, which would not provide L.M. "a specific level of 1:1 or 2:1 instruction," did not present "a situation where the school was 'factually incapable' of implementing the IEP." (Jan. 17, 2018 SRO Dec. at 20).

Further, the Parents claim the SRO cited but did not identify two Second Circuit decisions as summary orders and that demonstrates the SRO's decision is not entitled to deference because such cases do not control.  This argument is also unpersuasive.  Such cases are still relevant, even if not controlling, and, in any event, the SRO's decision contained twenty-five pages of careful analysis and considered the facts as gleaned through a review of an extensive administrative record.  That the Parents point to three "misappli[cations] of the law"—really

three problems with the SRO's citations—serves only to underscore the diligence that went into producing the decision.  (2016–2017 Parents' Mem. at 8).

Accordingly, the Parents' argument that the 2016–2017 SRO decision is not entitled to deference fails.

B.    Exclusion from Review of Appropriateness of IEP

The Parents next argue the SRO erred when it limited its review to whether the District could implement L.M.'s June 2016 IEP at RTES, rather than considering whether L.M.'s June 2016 IEP in itself was appropriate.

The Court disagrees.

An "IHO's decision is 'binding' upon the parties absent an appeal to the SRO." D.N. v. N.Y.C. Dep't of Educ., 905 F. Supp. 2d 582, 587 (S.D.N.Y. 2012) (quoting 8 NYCCR § 200.5(j)(5)(v)).  "[I]ssues that were decided by the IHO and not appealed or cross-appealed by the party against which they were decided are binding against that party, and on the SRO and th[e] [c]ourt, as to that party."  C.H. v. Goshen Cent. Sch. Dist., 2013 WL 1285387, at *9 (S.D.N.Y. Mar. 28, 2013).

Here, the SRO ruled that the Parents had abandoned on appeal the question of whether L.M.'s June 2016 IEP was appropriate because such claim was not addressed by the IHO, and the Parents were required to "to serve and file a cross-appeal with respect to such claims," which they did not do.  (See Jan. 17, 2018 SRO Dec. at 13).  The Parents argue they have the right to now argue, as an alternative ground upon which this Court might reverse the SRO's decision, the appropriateness of the IEP.  (See 2016–2017 Parents' Mem. at 42).  In support, the Parents cite Y.N. v. Bd. of Educ. of Harrison Cent. Sch. Dist., 2018 WL 4609117, at *16 (S.D.N.Y. Sept. 25, 2018) in which a court reasoned:

It does not necessarily follow that a party who does not cross-appeal a favorable IHO decision is precluded from asserting alternative grounds upon which a reviewing court might sustain or reinstate the IHO's judgment. Indeed, only a party aggrieved by the findings and decision rendered in an impartial hearing may appeal such findings and decision to the SRO. Plaintiffs were not aggrieved by the IHO's decision; rather, they prevailed at the impartial hearing, where the IHO agreed that S.N. was denied a FAPE for the 2015-16 SY and ordered the District to reimburse Plaintiffs for that year of Windward tuition. That Plaintiffs disagreed with some of the IHO's reasoning does not change the result; thus, there was nothing for Plaintiffs to appeal.

Id. at *16 (citing D.N. v. N.Y.C. Dep't of Educ., 905 F. Supp. 2d at 587–88)). In Y.N. the Court opted to "consider these arguments as potential alternate grounds for reversing the SRO's decision and upholding the IHO's decision." See id.

It is true the Parents prevailed before the IHO on the issue of whether the District failed to offer L.M. a FAPE with the proposed RTES placement. However, it is also true that the Parents' due process complaint did not challenge the appropriateness of the IEP, but only the substantive adequacy —i.e., respecting L.M.'s placement at RTES—and the procedural adequacy—i.e., the District's denial of Dr. DeGeorge's observation of the proposed placement— of the decision. (See 2016–2017 Ex. 1 at 3). Indeed, at the Parents' request, the IHO issued an interim decision on July 27, 2017, in which the IHO specifically rejected the Parents' argument that the appropriateness of the IEP was raised in the due process complaint. The IHO considered (i) the plain reading of the due process complaint, (ii) the Parents' argument that the complaint and attached documents raised multiple bases for review all of which signal the Parents' disagreement with the appropriateness of L.M.'s IEP, and (iii) whether the District opened the door to the challenge of the IEP. Ultimately, the IHO rejected the Parents' arguments and determined "that the issue of the appropriateness of the student's IEP is not properly before this hearing officer." (See 2016–2017 IHO Ex. IV at 11).

Despite the bold-type writing on the bottom of the July 27, 2017 Interim IHO Decision that "in an appeal to the State Review Officer from a final determination of an impartial hearing officer, a party may seek review of any interim ruling, decision or refusal to decide an issue" (2016–2017 IHO Ex. IV at 11), the Parents did not seek review of the interim ruling on appeal to the SRO.  (See 2016–2017 Verified Answer with Cross-Appeal at 1–2).  The Parents insist that because they received a favorable ruling on the proposed placement from the IHO, they therefore were not be obligated to raise on appeal the IHO's interim ruling on the appropriateness of the IEP.  But this argument is belied by the fact that the Parents did challenge on appeal the procedural adequacy, which was adverse, but not the interim decision, which also was adverse. See D.N. v. N.Y.C. Dep't of Educ., 905 F. Supp. 2d at 588 ("In any event, a party may only pursue such an appeal if she was 'aggrieved' by the IHO's findings of fact and decisions.") (citing 20 U.S.C. § 1415(g); 8 NYCRR § 200.5(k)(1)).  The Parents were aggrieved by the IHO's interim ruling, and yet did not challenge the ruling on appeal to the SRO.  Thus, the issue of the appropriateness of L.M.'s June 2016 IEP was not properly before the SRO.

Accordingly, the Court finds that the SRO did not err when it excluded from review the issue of whether the District's proposed June 2016 IEP was appropriate for L.M.

C.    Parents' Prospective Challenges to the June 2016 IEP

The Parents next argue the SRO erred in failing to address the Parents' prospective challenges to the June 2016 IEP and that the Court should reinstate the IHO's determinations respecting L.M.'s mainstreaming, sensory, discrete trial instruction and adaptive-skills needs.

The Court is not persuaded.

The SRO determined that because the IHO's findings that (i) the District's proposed placement did not allay the Parents' concerns regarding lack of mainstreaming; (ii) RTES could

not provide a sensory program to meet L.M.'s needs; (iii) the District did not provide an

appropriate amount of discrete trial instruction; and (iv) that RTES lacked an adaptive skills

program, "were not written elements required under [the District's] proposed June 2016 IEP,

these claims are not permissible challenges to [the District's] capacity to implement the IEP at its

own public school site."  (Jan. 17, 2018 SRO Dec. at 16).

        1.    <u>Appropriate Mainstreaming Opportunities</u>

The Parents argue the SRO erred because the decision did not address critical elements of

L.M.'s June 2016 IEP respecting mainstreaming opportunities.  The Court disagrees.  Such

argument implicates the IDEA's LRE requirement.  Under the LRE provision of the IDEA, a

state receiving federal special education funding must ensure that:

> To the maximum extent appropriate, children with disabilities, including children
> in public or private institutions or other care facilities, are educated with children
> who are not disabled, and special classes, separate schooling, or other removal of
> children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot be achieved
> satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  This requirement "expresses a strong preference for children with

disabilities to be educated, to the maximum extent appropriate, together with their non-disabled

peers." <u>Walczak v. Fla. Union Free Sch. Dist</u>., 142 F.3d at 122.  The implementing regulations

require school districts to ensure that a "continuum of alternative placements is available to meet

the needs of children with disabilities," including "instruction in regular classes, special classes,

special schools, home instruction, and instruction in hospitals and institutions."  34 C.F.R.

§ 300.115(a), (b)(1).

Because every child is unique, "determining whether a student has been placed in the

'least restrictive environment' requires a flexible, fact-specific analysis."  <u>P. ex rel. Mr. & Mrs.</u>

P. v. Newington Bd. of Ed., 546 F.3d at 113.  "Pursuant to that test, a court should consider, first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and, if not, then whether the school has mainstreamed the child to the maximum extent appropriate."  Id. at 120.

"[T]he LRE requirement is not absolute.  It does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 162.  Indeed, "[a]lthough the IDEA strongly prefers placing children in their least restrictive environment, the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students."  Id.

Here, the parties do not dispute the first prong; the CSE determined L.M. could not be educated in a general education setting.  Respecting the second prong, the SRO determined the IHO's findings respecting mainstreaming opportunities and lack thereof at RTES were not supported by the hearing record.  The SRO considered Dr. Mosca's testimony that "[s]ome of our students do mainstream[,] [i]t all depends on the student's IEP" and "depending on the student's needs" the District was capable of making arrangements for mainstreaming.  (2016–2017 Tr. at 249–250).  And Ms. Sansotta testified that the students in her 8:1+2 class "go[] to music, art, and phys. ed. with a general education class. . . . [with] [a] teaching assistant from the room" and "are integrated with their general education peers."  (2016–2017 Tr. at 340).  Despite the Parents' claim that RTES could not provide mainstreaming opportunities for lunch with nondisabled peers, Dr. Mosca testified that "we have general education students . . . work with our students and have lunch with them," and that the school has "the opportunity to have that . . . lunch buddy kind of system."  (2016–2017 Tr. at 253–54).

Accordingly, the Court finds the SRO did not err when it reversed the IHO's determination regarding mainstreaming opportunities available at RTES.

   2. Appropriate Sensory Program and Related Services

The IHO concluded there was insufficient evidence to determine whether RTES possesses the sensory program required to meet L.M.'s needs. The SRO did not address directly whether the proposed placement at RTES could satisfy L.M.'s June 2016 IEP as well. However, the hearing record supports a finding that the recommended special education programs identified in L.M.'s June 2016 IEP—twice-weekly thirty-minute occupational therapy sessions in the therapy room—would satisfy L.M.'s sensory needs. (See June 2016 IEP at 13). Indeed, Ms. Sansotta testified that teachers at RTES "work with the occupational therapist and the physical therapist. So usually if sensory needs are needed, we take on recommendations from them. We try to continue what they are working on within the OT, PT sessions into the classroom." (2016–2017 Tr. at 341).

Even though the Parents argue the District contracted with the occupational therapist, and thus RTES did not have a daily occupational therapist, and also that there was no sensory room or gym, like at Bronxville, at RTES, there is no indication in the hearing record to render RTES incapable of satisfying L.M.'s June 2016 IEP respecting his sensory needs.

Accordingly, the Court concludes RTES was capable of satisfying L.M.'s sensory needs.

   3. Appropriate Discrete Trial Instruction

The Parents argue that the SRO erred in reversing the IHO's decision that RTES could not provide discrete trial instruction and other ABA-programming in the classroom.[6]

---

[6] Discrete trial instruction is a type of ABA instruction methodology utilized for students with autism.

The Court disagrees.

The SRO considered Dr. Gaon's testimony that the District had entered into a contract in 2014 with the Carbone Clinic to "to support [District] programs for students with autism." (2016–2017 Tr. at 118).  Specifically, Dr. Gaon testified the Carbone Clinic "was providing consultant services to teachers that were working with students on the autism spectrum in our cohort classes, so in our [8:1+2] classes for students with autism or developmental disabilities." (Id. at 120).  The SRO also considered Dr. Mosca's testimony that "Carbone coaches the teachers in training the teacher assistants as well" (id. at 274), and "that "the consultants specifically adjust their program to the needs of the class and the needs of the teacher and the teaching assistant in the class." (Id. at 275).  The SRO concluded that the Carbone Clinic training provided to RTES staff, "was adjusted according to the needs of the staff and students, and could encompass discrete trials, token economies, and setting up an appropriate classroom for the students."  (Jan. 17, 2018 SRO Dec. at 22).

The SRO reviewed exhibits from the Carbone Clinic, which included "recommendations [for teachers] such as using fast paced instruction, use of frequent reinforcement, implementation of token economies, increasing 'manding' repertoire' data collection and analysis, reducing problem behaviors, teaching replacement behaviors, fading prompts, Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP), and Intensive Teaching Sessions (ITT)."  (Jan. 17, 2018 SRO Dec. at 22 (citing 2016–2017 Ex. M)).

The SRO concluded that just because the District did not implement 1:1 discrete trial instruction in the classroom, the District did not fail to provide L.M. a FAPE, because under ABA methodology, discrete trial instruction may be applied, but is not necessary.  Indeed, according to the Carbone Clinic consultant, "ABA and discrete trial instruction are not

synonymous. . . . [D]iscrete trial instruction does fall under ABA.  However, ABA itself, when

we teach skills, whether it's in group instruction or teaching an activity of daily living, not

necessarily discrete trial format, still utilizes that format of I give a specific instruction, I'm

looking for a specific response, and a specific consequence will follow."  (2016–2017 Tr. at

427).  Therefore, the SRO concluded that even though "the parents may have preferred that [the

District's] program include more discrete trial instruction . . . , the [District's] description of its

program does not lead to the conclusion that an ABA program as represented to the parent at the

CSE meeting would not be carried out."  (Jan. 17, 2018 SRO Dec. at 22–23).

4.    Appropriate Adaptive Skills Program

The SRO reversed the IHO's decision that the proposed placement at RTES would not

satisfy L.M.'s June 2016 IEP because the District lacked an adaptive skills program.  The Parents

argue this was in error.

The Court disagrees.

The SRO considered L.M.'s performance of the "Adaptive Behavior Assessment System-

Second Edition," which "highlighted [L.M.'s] struggles with communication and his ability to

understand the feelings, wants, and needs of others"  (Jan. 17, 2018 SRO Dec. at 17 (citing

2016–2017 Ex. 9 at 5)), in addition to L.M.'s June 2016 IEP, which "also indicated that the

student actively participated in adaptive science, music, art, and physical education classes 'with

adult assistance.'"  (Id. at 20 (citing 2016 June IEP at 8)).  Although RTES did not have a

separate adaptive skills program like that at Bronxville, Dr. Gaon and Dr. Mosca both testified

adaptive skills could be addressed in the classroom.  (See, e.g., 2016–2017 Tr. at 153–54, 265).

Moreover, as discussed above, Ms. Sansotta testified the students in her 8:1+2 class attended

general education music, art, and physical education classes with the teaching assistant, which

38

meant L.M. would mainstream for those subjects as well.  (Id. at 340).  Accordingly, the Court defers to the SRO's decision respecting the ability of the District to satisfy L.M.'s June 2016 IEP at RTES, even without the adaptive skills programs that were available at Bronxville.

As discussed above, the SRO's decisions respecting the District's proposed placement and its ability to satisfy L.M.'s June 2016 IEP are entitled to deference because the SRO carefully considered whether RTES would provide:  (i) opportunities to mainstream in the LRE; (ii)  instruction rooted in ABA methodology, which includes discrete trial instruction if necessary; (iii) adaptive skills programming; and (iv) sensory programs through twice-weekly occupational theory.  Such determinations are supported by the record and, importantly, they are "exactly the sort of policy judgment[s] on which . . . this Court should defer to the SRO."  S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ., 2014 WL 1311761, at *13 (E.D.N.Y. Mar. 30, 2014).

> D.   RTES Was Factually Capable of Implementing L.M.'s June 2016 IEP

> 1.   Access to Community

The SRO reversed the IHO's finding and determined that even though two of L.M.'s daily living skills goals, as identified in his June 2016 IEP, required community outings, such outings were not required to satisfy his IEP.  The Parents argue such reversal was in error.

The Court disagrees.

L.M.'s four daily living skills goals were:  "by June, [L.M.] will read and demonstrate comprehension of 20 warning and safety signals"; "[L.M.] will exchange coins up to a quarter and bills up to a twenty dollar bill to make purchases"; "[L.M.] will research, select, shop, and purchase 3 items at a store every week"; and "[L.M.] will use the post office and complete 3 different tasks related to using the post office."  (June 2016 IEP at 12).  The Parents insist all

four goals actually require community outings.  The parties agree that unlike Bronxville, RTES cannot readily provide access to the community.[7]

However, the SRO rejected the IHO's finding that such lack of access to the community denied L.M. a FAPE, and instead determined that L.M. need not go out into the community to attain his daily living skills goals.  The Parents argued this conclusion relied on impermissible retrospective testimony.  The Court disagrees.

The SRO first noted the June 2016 IEP did not explicitly set forth a requirement that the student be able to "generalize skills to other environments outside of the public school's sphere of influence," and determined that such generalization "to other environments beyond the school is not required in order to implement the student's June 2016 IEP."  (Jan. 17, 2018 SRO Dec. at 18).  The SRO's finding is supported by law.  Courts have found "services that seek only to generalize skills may not be required to provide a FAPE."  L.K. v. N.Y.C. Dep't of Educ., 2016 WL 899321, at *8.

Next, the SRO considered the testimony of Dr. Gaon that there were ways, other than school outings, for the student to gain community experience, and that outings were not a necessary component of the student's daily program, and that, even still, such opportunities would be available to L.M. at RTES.  (2016–2017 Tr. at 141) ("[L.M.] will have opportunities for community outings and . . . there are other ways to get the community outings in his life.  So I'm not sure that it's a necessary component of his daily program.").  However, Dr. Gaon also testified that the daily living goals could be addressed within the school setting through a "mock post office" and store.  (Id. at 150–51).

---

[7]     The SRO identified testimony from Dr. Mosca that the post office was not within walking distance of RTES.  (See 2016–2017 Tr. at 255–56).

Further, the Carbone Clinic consultant testified that students need not "wait[] until [a] community outing to try to generalize a skill." (2016–2017 Tr. at 441). However, the consultant also said without observing the student in that other setting, she would be unable to determine whether a student with autism could generalize to another setting outside of school a skill that he was taught in school. (Id. at 441–42)).

The SRO agreed with the District staff and consultant that a "contrived setting" would still allow RTES to work with L.M. on his annual goals. (Jan. 17, 2018 SRO Dec. at 19). Indeed, the SRO's decision is supported by the case law because the District has latitude to adopt programs to achieve L.M.'s goals. See M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 257 ("In light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, we cannot simply assume that the decision to rely heavily on a single method or style of instruction is necessarily inappropriate.").

Finally, the SRO concluded that to the extent RTES "could not arrange for community trips to the post office, or trips to the store (other than the school cafeteria), the district's inability to provide community outings was not such a material deviation from the student's IEP that it resulted in a denial of a FAPE." (Jan. 17, 2018 SRO Dec. at 19 (citing Y.F. v. N.Y.C. Dep't of Educ., 2015 WL 4622500, at *6)).

The Parents argue Y.F. is distinguishable from this case because here, the District does not dispute whether L.M. needs appropriate mainstreaming opportunities, sensory services, discrete trial instruction, and adaptive living skills instruction. But this attempt to distinguish fails to persuade. First, there is a dispute respecting whether discrete trial instruction is necessary when other ABA instruction may suffice. Second, and importantly, Y.F. regarded a dispute over how the District provided services required by the student's IEP, such as using

outside providers, and the district court determined that using outside providers was not a material deviation that constituted a denial of a FAPE.  Y.F. v. N.Y.C. Dep't of Educ., 2015 WL 4622500, at *6.  Here, the Parents argue the District's proposed method of meeting L.M.'s daily living skills goals, in the classroom, results in the denial of a FAPE, but, as the SRO reasoned, this would not be a material deviation from the IEP constituting a denial of a FAPE.  See also A.P. v. Woodstock Bd. of Educ., 370 F. App'x 202, 205 (2d Cir. 2010) (summary order).

Although the Court recognizes the daily living skills goals and the program offered by the District somewhat deviate, the SRO, after a thorough recitation of the facts and law, has determined that such deviation is not material.  On this record, the Court defers to the policy judgment of the SRO.

Accordingly, the Court affirms the SRO's decision that the District could work towards L.M.'s daily skills goals at RTES.

### 2. 1:1 or 2:1 Instruction

The Parents further argue the SRO erred when it reversed the IHO's decision that the 8:1+2 special class was insufficient to meet L.M.'s June 2016 IEP because L.M. required 1:1 or 2:1 instruction, and such instruction was not available in the RTES 8:1+2 class.

The Court is not persuaded.

The SRO reviewed L.M.'s June 2016 IEP and determined that it "does not explicitly state that [L.M.] required a specific amount of 1:1 or 2:1 instruction to derive educational benefit." (Jan. 17, 2018 SRO Dec. at 19).  In reaching this conclusion, the SRO noted instances in which the IEP described L.M. as benefitting from 1:1 and 2:1 instruction.  (See June 2016 IEP at 7–9). Specifically, the SRO noted that L.M. "learn[ed] best in a 1:1 structured environment"; L.M.'s ability to attend to task increased when working in a 1:1 or 2:1 setting; and L.M. responded

"very well" to 1:1 instruction.  (Id.).  The SRO also found L.M. "actively participated in adaptive science, music, art, and physical education classes 'with adult assistance.'"  (Jan. 17, 2018 SRO Dec. at 20 (citing June 2016 IEP at 8)).

Nevertheless, the SRO concluded the 8:1+2 special class would satisfy L.M.'s June 2016 IEP, because it would provide sufficient individual instruction.  Further, the SRO determined that because 1:1 or 2:1 instruction was not required by the IEP, the Parents could not show that the 8:1+2 special class at RTES, "was 'factually incapable' of implementing [L.M.'s] IEP."  (Jan. 17, 2018 SRO Dec. at 20 (citing G.S. v. N.Y.C. Dep't of Educ., 2016 WL 5107039, at *15)).

Further, the SRO noted the hearing record also supported a finding that L.M. would receive adult assistance at RTES.  The SRO cited Ms. Sansotta's testimony that she structured the assigned classroom so that students rotated between stations led by the two teaching assistants, thereby enabling her to attend to individual students for 1:1 instruction.  (2016–2017 Tr. at 335) ("So usually I'll split up my class between the other two teaching assistants to work on a small group activity, while I'll pull the other student one to one to work on whatever skill is needed.").

After reviewing the record, the SRO concluded L.M. would have had some opportunity for 1:1 and small group instruction if the recommended program was implemented at RTES.  And determinations such as "what class size is appropriate for a student is exactly the sort of policy judgment on which the Second Circuit has instructed that this Court should defer to the SRO."  S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ., 2014 WL 1311761, at *13.  Indeed, "a reviewing court is not entitled to overrule the State on a question of educational policy—such as whether a generally available resource is specially tailored to a particular disabled student's

needs—based merely on its own disagreement with the State's evaluation of that resource."

W.A. v. Hendrick Hudson Cent. Sch. Dist., 927 F.3d 126, 149 (2d Cir. 2019).

Accordingly, the Court affirms the SRO's decision that RTES was not "factually incapable" of meeting L.M.'s June 2016 IEP in the 8:1+2 special class.

> 3.   Social Skills Group

The Parents assert the SRO ignored facts and misapplied the law when it concluded the District placement afforded L.M. mainstreaming opportunities to develop his social skills.

The Court disagrees.

As discussed above, after reviewing the hearing record, the SRO rejected the IHO's determination that RTES could not mainstream in the LRE.  Moreover, District staff testified at the hearing that RTES could provide the mainstream social skills group mandated by L.M.'s June 2016 IEP.   (See, e.g., 2016–2017 Tr. at 249, 340).

The Parents contend the SRO committed legal error in concluding that, simply because non-disabled children are present in the school building, they are integrated with their disabled peers.  But that is not what the SRO concluded.  Rather, the SRO explained:  "Considering that the school had access to nondisabled peers for the student to socialize with, this is not a situation where the district public school was 'factually incapable' of implementing a mainstream social skills group."  (Jan. 17, 2018 SRO Dec. at 21 (citing Z.C. v. N.Y.C. Dep't of Educ., 2016 WL 7410783, at *9 (S.D.N.Y. Nov. 28, 2016)).

Accordingly, the Court finds the SRO did not commit legal error or ignore facts in concluding RTES was factually capable of satisfying L.M.'s June 2016 IEP respecting the social skills group.

4.     Training and Staff

The Parents argue the SRO improperly considered retrospective testimony respecting the

District's use of Carbone Clinic services because such services were not described in L.M.'s

June 2016 IEP.  The Parents further argue the Court should therefore reverse the SRO's finding

that RTES had the adequate training to implement L.M.'s IEP.

The Court disagrees.

The Second Circuit has adopted the "view that the IEP must be evaluated prospectively

as of the time of its drafting and therefore hold that retrospective testimony that the school

district would have provided additional services beyond those listed in the IEP." R.E. v. N.Y.C.

Dep't of Educ., 694 F.3d at 186 (discussed in context of a Burlington/Carter proceeding).

However, "sufficient permissible evidence, relied on by the SRO, support[ing] the SRO's

conclusion that the IEP offered [the student] a reasonable prospect of educational benefits"

would not be grounds to disturb the SRO's conclusion on its own.  K.L. ex rel. M.L. v. N.Y.C.

Dep't of Educ., 530 F. App'x 81, 85–86 (2d Cir. 2013) (summary order).

It is undisputed that the District may not present evidence at the IHO hearing that was not

included on the IEP.  See R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 186.  However, the SRO

considered record evidence that the Parents were informed at the June 2016 CSE meeting about

the Carbone Clinic and the provision of ABA programs at RTES.  For example, L.M.'s June

2016 IEP notes the Parents felt "the ABA program [wa]s not sufficiently established nor aimed

at providing academic benefit to [L.M.]."  (June 2016 IEP at 1).

The SRO further reviewed the record and found documentary evidence and testimony

from District staff demonstrating the Carbone Clinic consulted and trained the District teachers

on specific ABA methodology and principles.  (See, e.g., 2016–2017 Tr. at 274–275, 330; 2016–

2017 Exs. M, EEEE).  The SRO was persuaded by the testimony of Dr. Mosca, who stated she

believed that, given the presence of the Carbone Clinic, staff at RTES could implement L.M.'s

June 2016 IEP.  (See id. at 274–76).  And the SRO disagreed with Dr. Fiorile, who testified that,

based on her review of the Carbone Clinic consultation notes, the assigned class could not

implement L.M.'s IEP because monthly consultations were "insufficient to train staff who don't

have previous experience implementing ABA instructional programming." (2016–2017 Tr. at

837).

Accordingly, the Court affirms the decision of the SRO reversing the IHO's decision and

concluding RTES staff had the adequate training and experience to meet L.M.'s needs.

In short, the Court defers to the SRO's well-reasoned decision respecting RTES's ability

to satisfy L.M.'s IEP respecting:  (i) his daily living skills goals; (ii) 1:1 and 2:1 instructional

opportunities in a 8:1+2 special class; (iii) his social skills group; and (iv) adequate training and

staff.

E.     ESD Services and Pendency

The Parents argue the Court should affirm the decision of the SRO that L.M.'s pendency

placement at Bronxville includes ESD services for the 2016–2017 school year.

The Court agrees.

"[T]he IDEA's pendency provision entitles a disabled child to 'remain in [his] then-

current educational placement' while the administrative and judicial proceedings described

above are pending."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 152 (citing 20

U.S.C. § 1415(j)).  "That provision seeks to maintain the educational status quo while the

parties' dispute is being resolved."  Id.  It "require[s] that a school district continue to finance an

educational placement made by the agency and consented to by the parent before the parent

requested a due process hearing."  Mackey ex rel. Thomas M. v. Bd. of Educ., 386 F.3d 158, 163

(2d Cir. 2004)).  And the IDEA's implementing regulations require school districts to "ensure

that extended school year services are available as necessary to provide FAPE."  34 C.F.R.

§ 300.106(a)(1).

Here, the parties do not dispute the pendency placement at Bronxville for the 2016–2017

school year.  Thus, the only question before this Court is whether such pendency includes ESD

services.  The SRO determined "[t]he district's argument that pendency should not include the

after-school social skills group because it was not recommended by the June 2015 CSE is

unavailing as it was included as a part of the program the student was attending at the time the

due process complaint notice was filed."  (See SRO Jan. 17, 2018 SRO Dec. at 12).  Like the

SRO, the Court concludes L.M.'s pendency includes ESD services, because such services were

part of the last agreed-to IEP and placement.

Accordingly, for the reasons above, the Court affirms the SRO's decision with respect to

the 2016–2017 school year.

IV.   2017–2018 School Year

The Parents argue the SRO's decision that the District provided L.M. a FAPE for the

2017–2018 school year should not be entitled to deference, and further argue the Court should

affirm the SRO's decision that L.M.'s pendency placement at Bronxville included ESD services.

In addition, the Parents seek leave to obtain attorney's fees and costs related to L.M.'s pendency

placement for the 2018–2019 school year.

The Court disagrees with the Parents respecting the SRO's decision and finds the SRO's

decision is entitled to deference because it is thorough, well-reasoned and supported by the

record.  However, the Court grants the Parents leave to seek attorney's fees and costs for the pendency placement for the 2018–2019 school year.

A.    <u>Deference</u>

The Parents argue the SRO's decision is not entitled to deference because the SRO did not consider, or overlooked, contrary evidence, relied upon in the IHO's decision, which contained blatant errors and misapplied law.

The Court is not persuaded.

As discussed above, the Second Circuit has explained "the deference owed to an SRO's decision depends on the quality of that opinion," <u>R E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d at 189, or its "persuasiveness."  <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d at 244. "[F]ederal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d at 240.

Here, the SRO's decision that the District's proposed placement at RTES for the 2017–2018 school year offered L.M. a FAPE is entitled to deference, as it was well-reasoned, based on substantially greater familiarity with the evidence and the witnesses than this Court, grounded in thorough and logical reasoning, based on the same evidence as presently before the Court, and concerns the substantive adequacy of the IEP.

First, the Court rejects the Parents' assertion that the SRO relied on the IHO decision, which was riddled with problems.  Even if the Court were to cede the Parents' point that the IHO's decision had a number of problems, such determination does not bear on the Court's review of the SRO's thirty-five-page decision, which grapples with the hearing record before the

48

IHO and also documentary evidence the Parents had sought to include in the IHO hearing but the IHO omitted.  (See Feb. 19, 2019 SRO Dec. at 10–11).  In addition, the SRO acknowledged instances in which the IHO made mistakes.  (See, e.g., id. at 14–15) (discussing IHO's misapplication of the Burlington/Carter test).  Ultimately, the SRO concluded the IHO's mistake in applying the wrong standard "is largely academic . . . given that the district offered the student a FAPE."  (Id. at 16).

The Parents take umbrage with this finding and insist the SRO's determination "forces the parents to incur significant legal fees and out of pocket expenses without the prospect of reimbursement."  (19 Civ. 5496 Doc. #17 ("2017–2018 Parents' Mem.") at 12).  This complaint misses the mark.  What the SRO is saying is that because the SRO has determined the District offered L.M. a FAPE at the proposed placement at RTES, and performed its own thorough review of the hearing record, the IHO's mistakes, if any, are of no moment.

Second, and importantly, the Court rejects the Parents' claim that the SRO failed to consider contrary evidence and did not apply the law to the facts.  In support of their position, the Parents cite C.L. ex rel. H.L. v. N.Y.C. Dep't of Educ., 2013 WL 93361, *7, and M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125, 166 n.18 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012).  But here, the SRO did grapple with contrary evidence and testimony from the Parents, their expert, and the Bronxville teachers.  (See, e.g., Feb. 19, 2019 SRO Dec. at 25, 29, 30, 34, 35).  Indeed, a full reading of the SRO's decision indicates the SRO repeatedly considered the Parents' arguments along with the record.  For example, the SRO reviewed L.M.'s Bronxville teacher's statements from the June 2017 CSE meeting, discussing L.M.'s 1:1 instruction and frequent sensory breaks (see 2017–2018 Ex. PP at 14:15–15:20), as well as documentary evidence and testimony from Dr. Fiorile that L.M. worked well in a 1:1 setting and followed

instructions in small groups (2017–2018 Ex. LL at 11–13, 15; 2017–2018 Tr. at 1040–42). However, the SRO found that the record taken as a whole supported the conclusion that L.M.'s IEP could be satisfied in a 8:1+2 special class.  (See Feb. 19, 2019 SRO Dec. at 21–23).

Accordingly, the Court finds the SRO's decision is entitled to deference.

B.      RTES Was Capable of Implementing L.M.'s June 2017 IEP

The Parents next argue the SRO erred in finding the District was not factually capable of implementing L.M.'s June 2017 IEP because the District could not provide community outings, 1:1 or 2:1 instruction, and social skills groups with nondisabled peers.

The Court disagrees.

After careful review of the record, the SRO determined that RTES could satisfy L.M.'s June 2017 IEP.  The SRO's decision was well-reasoned and supported by ample evidence in the record, including the hearing transcript, which captured testimony of District staff, outside consultants from the Carbone Clinic, and documentary evidence.

1.      Access to the Community

The Parents argue the SRO summarily accepted the IHO's position that the programs at Bronxville and RTES were similar and therefore were not meaningfully different, even though RTES could not provide L.M. community outings.  But the Parents misstate the SRO's findings. The SRO actually said that "assuming that the lack of access to community outings would have represented a failure of the district to implement the student's IEP, such a failure would have to amount to a material or substantial deviation from the student's IEP in order to constitute a denial of a FAPE."  (Feb. 19, 2019 SRO Dec. at 34 (citing A.P. v. Woodstock Bd. of Educ., 370

50

F. App'x at 205; <u>M.L. v. N.Y.C. Dep't of Educ.</u>, 2015 WL 1439698, at *11–12 (E.D.N.Y. Mar. 27, 2015)).

It is undisputed that Bronxville provided L.M. community outings to the post office and stores in furtherance of practicing and generalizing skills.  (<u>See</u> 2017–2018 Ex. PP 29:05–29:30; 31:12–32:40).  Indeed, L.M. experienced at Bronxville first-hand "concepts such as [the] post office and money skills" (Ex. 2017–2018 Ex. OO at 1), which were referenced in his June 2017 IEP.  (<u>See</u> June 2017 IEP at 12).

To assess whether RTES could provide these services in accordance with L.M.'s June 2017 IEP, the SRO reviewed L.M.'s daily living skills goals:  "Within the community setting, [L.M.] will approach the counter to order one item with minimal prompting (e.g., upon entering a food establishment, [L.M.] will locate the counter and place his order with an appropriate person)."  (June 2017 IEP at 12).  The SRO then determined that the lack of access to the community for outings was insufficient to render the placement at RTES incapable of satisfying the IEP because the June 2017 IEP does not specify what need was targeted by the student's goal to approach a counter and order a food item with minimal prompting within a community setting.  (<u>See</u> Feb. 19, 2019 SRO Dec. at 34).  In reaching this conclusion, the SRO credited Dr. Fiorile's testimony about the importance of access to the community for students with autism, for the purpose of generalizing skills across environments.  (2017–2018 Tr. at 1054).  But because generalizing to other environments outside of school is not required by the IDEA when classroom learning would otherwise suffice, the SRO determined that the inability to access the community at RTES was not a material deviation from the IEP so as to deny L.M. a FAPE.

(Feb. 19, 2019 SRO Dec. at 35) (citing F.L. v. N.Y.C. Dep't of Educ., 2016 WL 3211969, at

*11; L.K. v. N.Y.C. Dep't of Educ., 2016 WL 899321, at *8–10)).  The Court agrees.

2.    1:1 and 2:1 Instruction

The Parents argue there is nothing in the hearing record to support the SRO's finding that

RTES's 8:1+2 special class, as opposed to Bronxville's 8:1+4 special class, was reasonably

calculated to enable L.M. to receive educational benefits.

The Court disagrees.

The SRO considered testimony from L.M.'s 2016–2017 school year teacher at Bronxville

that L.M. received 1:1 instruction to sustain focus when he was taught new concepts and that he

required adult support for academic instruction.  (See 2017–2018 Tr. at 748, 765–66).  The SRO

also considered testimony from Dr. Mosca that the June 2017 CSE discussed L.M.'s progress

and the amount of teacher support he required, and her view was that Bronxville provided "a lot

of staff" and was "quite restrictive."  (See 2017–2018 Tr. at 518).  The SRO credited Dr.

Mosca's testimony that L.M. did not need as much support as the 8:1+4 special class provided

because L.M. had achieved certain of his study skills goals (i.e. maintaining attention on task

during class lessons and assignments in order to complete assignments on time on a daily basis

across all academic settings, and independently coming to a group meeting).  (Feb. 19, 2019

SRO Dec. at 21 (citing 2017–2018 Tr. at 517–27)).  The SRO also considered the District

psychologist's testimony about the importance of independence versus the need for 1:1

instruction.  (See 2017–2018 Tr. at 209–12).  Given that L.M. had shown independence the

previous year, it was not improper for the SRO to conclude that an 8:1+2 special class would be appropriate to satisfy L.M.'s IEP.  (Feb. 19, 2019 SRO Dec. at 21–23).

The Court affirms the SRO's decision about the appropriate level of instruction because it is tethered to L.M.'s IEP, considers relevant facts, and applicable law, and therefore is entitled to deference.  Moreover, determinations respecting appropriate class sizes are the type of decisions for which the Court should defer to the SRO.  See S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ., 2014 WL 1311761, at *13.

          3.     Social Skills Groups

The Parents argue the SRO erred in finding that RTES could meet L.M.'s social skills needs.

The Court disagrees.

The June 2017 IEP identifies L.M.'s annual social skills goals, such as:  "secure the attention of a peer before commenting or requesting, by calling his/her name, during a group session in 4/5 trials, with no more than 1 verbal cue"; "ask a question to his peer and wait for him/her to answer"; and "strengthen . . . social communication skills (i.e. reciprocal conversation regarding personal interests[).]"  (June 2017 IEP at 11–12).  To achieve these goals, the CSE recommended three sessions per week of speech-language therapy and twice weekly small group social skills instruction consisting of one session with peers in the same grade and one with students in the grade below.  (See id. at 13).  Thus, it is undisputed L.M.'s IEP required social skills groups, with a small group, once a week with L.M.'s peers, and once a week with peers in the grade below.

The Parents insist the SRO erred in finding RTES was capable of providing the social skills group.  Specifically, the Parents argue the SRO overlooked RTES principal Jamal

Doggett's testimony that he could not say for certain there would be a social skills group for L.M. for the 2017–2018 school year.  But the testimony the Parents cite does not support such position.  Indeed, when asked whether a social skills group previously existed for the autism cohort, the principal testified "I'm not sure," but when asked whether it would exist for the next year, he replied:  "I just need to know exactly what the social skills group is, a definition before I answer saying I know that we have it.  I'm pretty sure, but I need a description of exactly what it is." (2017–2018 Tr. at 671–72).  The Parents further argue Dr. Gaon testified that as of the June 15, 2017, CSE meeting, she did not know whether RTES had any social skills groups with mainstream peers.  But this misstates Dr. Gaon's testimony, because she answered she did not know whether RTES had mainstream social skills programs the prior year, not prospectively. (Id. at 311–312).  Moreover, as she was quick to point out, the questions asked by the Parents' attorney were being asked "in the negative" with possible "double negative[s]." (Id. at 312).

The SRO considered other evidence—such as the testimony of the District school psychologist—that, given L.M.'s progress and his needs, he could engage in developing these conversational skills with peers throughout the school day "in situ," and thus additional social skills instruction was not needed.  (2017–2018 Tr. at 217–18).  This statement was supported by Dr. Mosca, who testified L.M. did not require additional social skills groups to further develop.

Moreover, the SRO noted L.M.'s IEP reflected that at Bronxville, he also participated in ESD services through an afterschool program three times a week, "for recreational skills . . . in a leisure setting." (2017 June IEP at 2).  However, the SRO credited Dr. Mosca's testimony that the data did not show L.M. needed ESD services to address his social skills group, given his demonstrated progress.  (See 2017–2018 Tr. at 514–16).  Indeed, Dr. Mosca explained that if the benefit of the ESD program at Bronxville was to help L.M. generalize his skills, although such

54

generalization of skills was important, they were not the District's responsibility and, therefore, as Chair of the CSE, Dr. Mosca opted not to include ESD services in L.M.'s IEP.  (See id. at 511–14).  Dr. Fiorile testified that ESD services helped L.M., but she too corroborated statements that the ESD program served to provide additional opportunities for generalization of skills.  (2017–2018 Tr. at 1117–18).  Indeed, such determination was supposed by the Bronxville teacher's statements at the June CSE meeting in which it was explained that the ESD program does not work on L.M.'s IEP but rather services to help L.M. with generalization.  (See 2017– 2018 Ex. PP at 56:00–56:36).

The SRO agreed with the District that such ESD services—if for the purpose of generalizing social skills—were not required by the IDEA, and thus, ESD services were not required for L.M.'s FAPE because the program offered by RTES during the school day would address L.M.'s identified social skills needs.  (See Feb. 19, 2019 SRO Dec. at 25–26) (collecting cases).

For the reasons discussed above, the Court finds the SRO decision respecting L.M.'s social skills and the ability of RTES to provide such social skills groups is entitled to deference.

C.    Parents' Challenges to RTES's Actual Capabilities

The Parents next contend "the services and supports offered to [L.M.] at Bronxville far exceeded the services and supports actually written into the IEP" (2017–2018 Parents' Mem. at 18), and thus challenge L.M.'s June 2017 IEP.  However, the issue of the appropriateness of L.M.'s June 2017 IEP is not properly before the Court.  Moreover, the District is not required to provide L.M. his Parents' preferred placement, but rather is required to provide a placement reasonably calculated to enable L.M. to receive educational benefits.  See Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 194–95 ("A school district is not, however, required to furnish 'every

special service necessary to maximize each handicapped child's potential.'") (citing <u>Bd. of Educ.</u> <u>of Hendrick Hudson Cent. Sch. Dist., v. Rowley</u>, 458 U.S. at 109).  The SRO determined, after reviewing the hearing record, that the District was capable of providing services in accordance with L.M.'s June 2017 IEP.   The Court defers to the SRO's decision respecting same.

In fact, the Parents seem to take issue with the substance of L.M.'s June 2017 IEP, as opposed to the District's proposed placement.  For example, the Parents criticize Dr. Mosca's decision to not recommend ESD services in L.M.'s IEP.  Such veiled challenge is about the IEP itself, rather than RTES's ability to implement it.  (<u>See</u> 2017–2018 Parents' Mem. at 23 (discussing <u>A.M. v. N.Y.C. Dep't of Educ.</u>, 845 F.3d 523 (2d Cir. 2017) (finding that, when a district representatives' views are "against the clear consensus of the substance of the evaluative materials present at the CSE meeting and the views of [the student's] evaluators and educations instructors," the resulting IEP "was not 'reasonably calculated to enable [the student] to receive educational benefits,'" rendering the IEP "substantively inadequate" and denying the student a FAPE)).  But the Parents did not appeal the substance of the IEP.  Therefore, disputes about the appropriateness of L.M.'s IEP are not properly before this Court on appeal.

The Parents next argue the SRO erred in finding that—because the June 2017 IEP did not include annual goals related to the student's sensory needs and that such sensory services and occupational therapy were available at RTES—the lack of sensory supports were not grounds to determine the District had denied L.M. a FAPE.  The Parents assert the SRO then proceeded to discount the testimony of Dr. Fiorile and L.M.'s Bronxville teacher.  The Parents argue that in addition to overlooking facts, the SRO misstated the law on the issue, because the SRO cited <u>J.B.</u> <u>v. New York City Dep't of Educ.</u>, 242 F. Supp. 3d 186, 199 (E.D.N.Y. 2017)—which in turn cites <u>J.L. v. City Sch. Dist. of City of New York</u>, 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20,

2013)—for the proposition that courts in this Circuit are reluctant to find a denial of a FAPE when an IEP does not identify goals or methods of measuring progress.  The Parents contend the SRO overlooked the fact that in J.L., the district court noted "the sufficiency of goals and strategies in an IEP is quintessentially the type of issue which deference to the expertise of the administrative officers is appropriate."  J.L. v. City Sch. Dist. of City of New York, 2013 WL 625064, at *13.

Once again, though, the Parents miss the mark.  The SRO reviewed the June 2017 IEP and determined the IEP offered supports to address L.M.'s sensory needs, such as sensory breaks, and that RTES could meet those needs.  Specifically, the SRO considered testimony from the District's special education teacher Danielle Grandazzo that there were:

> opportunities for sensory input both in the classroom and in the building, including an area of the classroom designated for sensory input (with several different bins of sand, rice, and beans, as well as different types of playdough and slime), a designated space for [occupational therapy] in the building, and a separate area with a swing that was accessible to students throughout the day.

(Feb. 19, 2019 SRO Dec. at 19 (citing 2017–2018 Tr. 376–77, 405–07)).  That same teacher further explained sensory activities were also incorporated in the classroom (i.e., yoga, dancing, use of sensory table).  (2017–2018 Tr. at 405–08).  Thus, the Court rejects the Parents' contention that "[n]othing in the record supports a conclusion that the IEP met, or that the placement at [the District] could meet, L.M.'s sensory needs." (2017–2018 Parents' Mem. at 25).

The Parents next argue the District overlooked the realities of L.M.'s situation, including his mother's testimony that he is not independent throughout the day.  (See 2017–2018 Tr. at 936–39).  Thus, the Parents contend L.M. cannot meaningfully access his education without adult assistance.  And the Parents argue the District's proposed placement did not provide the 1:1 support L.M. required.  See M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 254 ("the key failing of

57

the IEP was its failure to account for [a] report—dated two months before the relevant hearing of

the CSE—that [the student] required intensive 1:1 instruction.").  The Parents expert, Dr. Fiorile,

corroborates these assertions.  (See 2017–2018 Tr. at 1043, 1107–08).  However, the SRO

considered the testimony of Alexandra Vefeadeas, L.M.'s special education teacher at Bronxville

for the 2016–2017 school year, that L.M. made progress during that year, followed his schedule

independently, knew what was expected of him during academic tasks, and navigated the

building to frequent services.  (2017–2018 Tr. at 737–48; June 2017 IEP at 1–2).  Accordingly,

the SRO weighed the evidence and determined—over the Parents' objections—that the 8:1+2

class was appropriate given L.M.'s independence.

The Court concludes the SRO's decision regarding RTES's actual capabilities to address

L.M.'s social, sensory, and independence needs is entitled to deference and is affirmed in those

respects.

        D.      <u>Mainstreaming Opportunities</u>

The Parents argue the District's proposed placement is not the LRE, and that the SRO's

decisions should not be entitled to deference.

The Court disagrees.

As discussed above, the Second Circuit applies a two-pronged test to determine whether

an IEP and the proposed placement places the student in the LRE.  See <u>P. ex rel. Mr. and Mrs. P.</u>

<u>v. Newington Bd. of Educ.</u>, 546 F.3d at 113.  "[F]irst, whether education in the regular

classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a

given child, and if not, then [second] whether the school has mainstreamed the child to the

maximum extent appropriate."  <u>Id</u>. at 120.

As an initial matter, the SRO was not required to address the LRE in great detail, because the Parents failed to articulate, as required by 8 NYCRR 279.8(c)(2) and 8 NYCRR 279.4(f), that the IHO erred in this specific determination.  (See Feb. 19, 2019 SRO Dec. at 27).   Nevertheless, the SRO undertook an extensive analysis of the LRE and determined that the District's proposed placement at RTES offered L.M. a number of mainstreaming opportunities, in accordance with his IEP.

For the first prong, again, it is undisputed that L.M. could not be appropriately educated in a general education setting.  For the second prong, L.M.'s June 2017 IEP recommended that he "continue to mainstream for lunch and recess and also for an additional period daily."  (June 2017 IEP at 2).

The SRO found the District could meet L.M.'s mainstreaming goals because the June 2017 IEP indicated that at RTES, L.M. "will have lunch and recess with typically developing peers in addition to one extra period during the day such as art, physical education, or an academic period as appropriate."  (June 2017 IEP at 15).  The SRO noted that this was in addition to the two sessions per week of a social skills group, which would include nondisabled peers in the student's grade and one grade below.  (See Feb. 19, 2019 SRO Dec. at 29).

The Parents argue the District advocated for limiting L.M.'s mainstreaming opportunities at RTES because, according to the special class teacher, students in the 8:1+2 special class mainstream only for specials, whereas at Bronxville, L.M. mainstreamed "for specials" as well as "any academic opportunities that [were] appropriate," and opportunities that would present "on the fly."  (2017–2018 Tr. at 785).  But again, this misstates the testimony.  Ms. Grandazzo testified, "my class, the [8:1+2] class, is mainstreamed for all specials," (2017–2018 Tr. at 409–11) (emphasis added).

As the SRO concluded, "the June 2017 IEP offered a plan for mainstreaming the student and, to the extent the IEP lacked greater detail" this would allow for flexibility.  (Feb. 19, 2019 SRO Dec. at 30).  Accordingly, the SRO determined the opportunities to mainstream L.M. at RTES did not support a finding that the District's proposed placement did not offer L.M. the LRE.  The SRO added, "[o]n the contrary, the evidence in the hearing record supports a finding that the June 2017 IEP provided for [L.M.'s] inclusion in school programs with nondisabled students to the maximum extent appropriate."  (Id. (citing P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ., 546 F.3d at 120)).

As discussed above, the Court defers to the SRO's well-reasoned decision respecting the proposed placement's ability to satisfy L.M.'s 2017 IEP.  Accordingly, for the reasons discussed above, the Court affirms the SRO's decision that the District did offer L.M. a FAPE for the 2017–2018 school year.

> E.     Pendency for ESD Services

Finally, the Parents argue they should be granted leave to file an application for reimbursement of statutory attorney's fees and costs related to the District's initial failure to pay for ESD services for the 2018–2019 school year while these appeals were pending.

The Court agrees.

As discussed above, "the IDEA's pendency provision entitles a disabled child to 'remain in [his] then-current educational placement' while the administrative and judicial proceedings described above are pending."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 152 (citing 20 U.S.C. § 1415(j)).

The Court agrees with the SRO that L.M.'s pendency placement for the 2017–2018 school year remained at Bronxville, and such placement included ESD services.  The District has

attached to its submission a settlement with the Parents for the 2017–2018 school year respecting the ESD services.  (Partial Stipulation of Settlement ¶¶ 1, 2).   Accordingly, the Parents have waived all claims respecting ESD services for the 2017–2018 school year.

However, the Parents maintain a claim for costs and attorney's fees relating to the pendency provision in the 2018–2019 school year.  In essence, the Parents argue that they would not have had to file another due process complaint for the 2018–2019 school year had the District initially paid for the ESD services for that year.  This is the issue the IHO refused to reach.  (See Feb. 19, 2019 SRO Dec. at 14) ("The only dispute pertains to a question of the duration of the student's pendency.").  The SRO reviewed the record and determined the IHO was wrong to refuse to issue a decision respecting pendency, because during the hearing, the parties agreed L.M.'s pendency placement at Bronxville included ESD services.  The SRO ordered the District to continue to pay for ESD services during the 2018–2019 school year, and the District complied.

In short, the Court finds the Parents prevailed with respect to whether the District was required to pay for ESD services for the 2018–2019 school year, and that they are entitled to statutory attorney's fees and costs with respect thereto.

## CONCLUSION

The Parents' motions for summary judgment are DENIED IN PART and GRANTED IN PART.

The District's motions for summary judgment are GRANTED IN PART and DENIED IN PART.

Accordingly, the decisions of the state review officers are affirmed with respect to both the 2016–2017 and 2017–2018 school years.

With respect to the limited question of whether the District was required to pay for extended school day services at Bronxville for the 2018–2019 school year, the Court grants leave to the Parents to submit an application for statutory attorney's fees and other recoverable costs, both at the administrative level and in this action.  The application shall be filed by August 7, 2020.  The District's response, if any, shall be filed by August 21, 2020.

The Clerk is instructed to terminate the motions (18 Civ. 4409 Docs. ##36, 40; and 19 Civ. 5496 Docs. ##15, 20, 21).

The Clerk is further instructed to close case no. 18 Civ. 4409.  Case no. 19 Civ. 5496 shall remain open pending decision on the Parents' application for attorney's fees and costs.

Dated:  July 8, 2020
        White Plains, NY

                              SO ORDERED:


                              _____
                              Vincent L. Briccetti
                              United States District Judge